**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

WAYNE EARL ZAVODA,

      Petitioner,                  Civil No. 04-CV-70811-DT
                                     HONORABLE GEORGE CARAM STEEH
v.                               UNITED STATES DISTRICT JUDGE

BLAINE C. LAFLER,

      Respondent,

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Wayne Earl Zavoda, ("petitioner"), presently confined at the Newberry
Correctional Facility in Newberry, Michigan, seeks the issuance of a writ of
habeas corpus pursuant to 28 U.S.C. § 2254. [1] In his application, filed by attorney
Stephen H. Boak, petitioner challenges his conviction and sentence for first-
degree felony murder, M.C.L.A. 760.316; first-degree criminal sexual conduct,
M.C.L.A. 750.520b; and first-degree child abuse, M.C.L.A. 750.136b(2). For the
reasons stated below, the application for writ of habeas corpus is **DENIED.**

### I. Background

Petitioner was convicted of the above offenses following a jury trial in the
Genesee County Circuit Court. The victim in this case was petitioner's three year
old daughter, Heather Zavoda.

---

[1] When petitioner originally filed this application for a writ of habeas corpus, he was incarcerated
at the Saginaw Correctional Facility in Freeland, Michigan.

Russell Swarthout was petitioner's initial counsel and represented petitioner at his preliminary examination and several pre-trial hearings. Swarthout had agreed to represent petitioner on a *pro bono* basis, with the understanding that he would be representing petitioner in a civil case against Hurley Hospital for causing the victim's death due to medical malpractice. In October of 1998, petitioner asked to have his current counsel, Stephen H. Boak, substitute as counsel and sent a letter to Swarthout advising him of his desire to have Boak replace him as counsel. Swarthout never responded to this letter or any telephone calls. Petitioner's mother, Patricia Zavoda, filed a complaint against Swarthout with the Attorney Grievance Commission, claiming that Swarthout had refused to withdraw as counsel unless she continued to engage in sexual relations with him.

On December 23, 1998, petitioner executed a second consent to have Mr. Boak substitute Mr. Swarthout as his trial attorney. However, at a pre-trial conference on January 14, 1999, petitioner elected to continue to be represented by Mr. Swarthout. The trial court adjourned the trial date because of health problems that Swarthout had been suffering from. However, the trial court expressed concern that Swarthout's health problems might prevent him from being able to effectively defend a capital murder case.

Several subsequent pre-trial conferences were adjourned because Mr. Swarthout had failed to file his witness list with the court and the prosecutor, as

2

required by Michigan law.  During several of these pre-trial conferences, Mr. Swarthout indicated that he supplied the prosecutor's office with medical reports which showed that petitioner did not cause his daughter's death.  Mr. Swarthout indicated several times that he expected the prosecutor to dismiss the charges against petitioner after reviewing these reports.  At a pre-trial conference on March 18, 1999, the trial court finally advised Mr. Swarthout that the prosecutor would not be dismissing the charges in this case.

On April 26, 1999, the trial court appointed Phillip Beauvais to act as co-counsel for Mr. Swarthout, to prevent another adjournment of the trial should Swarthout be unable to proceed.

On May 3, 1999, petitioner again wrote to Mr. Swarthout to terminate his services.  However, on May 18, 1999, petitioner again elected to continue with Swarthout as his counsel.

On June 8, 1999, Mr. Beauvais filed a motion to quash the information, which was denied by the trial court on June 14, 1999.

The trial date of June 22, 1999 was adjourned, again at Swarthout's request.  Mr. Swarthout asked for an adjournment, first because of health problems, and secondly, because he believed that a meeting between his medical experts and the prosecution's medical experts might possibly avoid the need for a trial.  The trial court agreed to the adjournment, but noted that the handling of the defense case was "totally incomprehensible."  At this hearing, the

3

trial court appointed Phillip Beauvais to act as lead counsel and gave him the authority to determine what role that Mr. Swarthout would take in the case.

Trial finally commenced on July 13, 1999. Mr. Beauvais agreed to conduct the jury selection, make the opening statement, and cross-examine all of the witnesses other than the medical witnesses. Mr. Swarthout agreed to conduct the cross-examination of the prosecution's medical witnesses and to do the direct examination of any defense medical witnesses.

The trial testimony established that in June of 1998, petitioner resided in a mobile home in Mundy Township, Michigan with his wife Kim Zavoda, and their two young children, Heather and Eric. [2]  Kim Zavoda's ex-husband, Michael Wolfe, owned this mobile home and resided there as well.

The prosecution's first witness, Jeremy Huneycutt, was a thirteen year old boy who lived in the same mobile home park as petitioner and his family. On June 19, 1998, at approximately 1:00 p.m., Huneycutt witnessed a man come out of a mobile home and strike a girl in the face with his hand, before kicking her in the head. Huneycutt testified that he witnessed this same girl getting hit two weeks after June 19th, although he later changed his story to indicate that he witnessed this event two weeks prior to June 19th. Huneycutt never positively identified petitioner as being the man whom he saw strike or kick the girl.

_____

[2]  At the time of trial, Kim Zavoda was calling herself Kim Furister. For purposes of clarity, this Court will refer to the witness as Kim Zavoda throughout the opinion.

4

Kim Zavoda testified that she and Michael Wolfe left the mobile home at about 6:00 p.m. on June 19, 1998 to go play bingo at a local church. Heather and Eric were left in petitioner's care. When Kim Zavoda and Wolfe left, Heather was in good health.

Petitioner took his children to the home of Thomas Shellenbarger and Kristin Clute in Otter Lake, Michigan. Petitioner worked on his car, drank beer, and smoked some marijuana with Shellenbarger. On a couple of occasions, petitioner struck the victim in the head in a manner which concerned Shellenbarger. Petitioner left his daughter with Clute and went with Shellenbarger to Flint to purchase and smoke more marijuana. Petitioner returned to Shellenbarger's house in Otter Lake. Petitioner remained there for only ten minutes before stating that he had something to do. Petitioner roughly grabbed his daughter, who was then sleeping, from the floor and rushed out of the door. While exiting the house, petitioner banged his daughter's leg against the door frame and possibly banged her head against his car as he threw her into it. After witnessing this treatment, Shellenbarger and Clute considered calling the police, but refrained from doing so. Before leaving the Shellenbarger/Clute house, the victim did not display any marks or injuries on her. Shellenbarger testified at trial that just prior to testifying at petitioner's preliminary examination, petitioner pointed at him and told him that he was dead.

When petitioner returned with his daughter to his house at approximately

5

1:00 a.m., Kim Zavoda noticed red marks on her daughter's face.  Kim Zavoda

testified that her daughter's head was also cocked at an odd angle and she

appeared unresponsive.  Kim Zavoda asked petitioner, "what did you do to her–

there are marks on her chin".  Petitioner replied that a cat did this to their

daughter.  Petitioner put their daughter into bed and yelled at Kim Zavoda to get

their baby son, Eric, out of the car.  Petitioner told Kim that Heather was okay,

and that she was merely sleepy and suffering from a cold.

Petitioner subsequently ordered Kim and Michael Wolfe to purchase some

food for him from the Burger King.  The two complied with petitioner's request,

returning home around 2:30 a.m.

The following morning, Kim was unable to wake Heather and observed her

daughter's eyes rolled back, discharge gushing from her mouth, and blood

flowing out of her nose.  Petitioner refused to allow Kim to dial 911 for an

ambulance.  Instead, petitioner yelled at Kim, told her that their daughter had the

flu, and even removed the telephone from the wall and locked it in his bedroom.

Petitioner told Kim to have Michael Wolfe take Heather to the hospital in his car.

Petitioner refused to visit his daughter at the hospital following her

admission, even after being requested to do so by medical personnel.  Petitioner

also claimed that he could not come to the hospital because he did not have any

gas money.  When Kim informed petitioner of Heather's condition, petitioner

replied, "Well, it looks like we've got a dead daughter."  Kim Zavoda testified that

6

there was, in fact, money for gasoline on the counter in petitioner's bedroom.  In spite of petitioner's claim that he lacked gas money to make the trip to the hospital, petitioner drove to the homes of two friends to socialize and to help one friend stack wood for an hour and a half.  Petitioner was arrested at 5:00 p.m. on June 20, 1998.  Petitioner never visited his daughter in the hospital.

After two days in intensive care, Heather Zavoda died on June 22, 1998.

Kim Zavoda testified that she told the doctors at the hospital that petitioner hit her and Heather, but didn't believe that he would rape their daughter.  Kim Zavoda testified that petitioner had threatened to send friends to kill her if she informed anyone that he had hit her and the kids.  Kim Zavoda later clarified that petitioner made this threat to her all the time and not only in regard to the incident which lead to Heather's death.  Kim Zavoda claimed that she had covered up for petitioner because she was afraid of him.  Kim Zavoda admitted giving a different version of the evening's events to the doctors because she was afraid of petitioner.  She also admitted telling the police that Michael Wolfe was jealous of petitioner.

Michael Wolfe's testimony mirrored Kim Zavoda's in many respects.  Wolfe testified that he had seen petitioner hit Heather on an unknown date in the past.  Wolfe also testified that petitioner threw his son Eric when Eric was three to five months old.

Dr. Brian Nolan, Director of Pediatric Care at the Hurley Medical Center,

7

was the lead physician in charge of Heather Zavoda's treatment.  Dr. Nolan diagnosed Heather with hypoxia or lack of oxygen to the brain, and child abuse. Dr. Nolan testified to a degree of medical certainty that he believed that the child's death was caused by child abuse.  Dr. Nolan placed great emphasis on the fact that petitioner never came to visit his daughter at the hospital, indicating that petitioner's non-appearance was one criteria of child abuse.

Dr. Melissa Hamp, a specialist in Pediatric Critical Care and Director of the Adolescent Clinic and Pediatric Residency Program at Hurley Hospital, examined Heather for possible sexual abuse.  Dr. Hamp noticed bruising on Heather's chest and a fresh circumferential bruise around Heather's anal opening.  Dr. Hamp's examination strongly suggested to her that Heather had been anally penetrated with some object.  Dr. Hamp indicated that with the exception of some slight redness, which would not be unusual for a three year old who might be going to the bathroom by herself, the victim's vagina appeared normal.  Dr. Hamp ruled out that these injuries were caused by medical treatment or the normal activities of a small girl.  Dr. Hamp also observed fresh abrasions on the child's knees, which she found significant in her diagnosis of sexual abuse.  Dr. Hamp testified that she had no doubt that there had been forcible penetration of Heather Zavoda's anus by some object.

Dr. Kanu Virani, a Forensic Pathologist and Deputy Chief Medical Examiner for Oakland County, performed the autopsy on Heather.  Dr. Virani

8

testified that he found bruising on the girl's genital area, abrasions from her forehead to her chin on the left side, an abrasion on the back, right side of her neck, abrasions on both of the girl's knees, small lacerations on her rectal area, a bruise on the back of her vaginal area, and three areas of bleeding under the skin that covered the girl's skull. Dr. Virani believed that the cause of the victim's death was positional asphyxia, a lack of oxygen to the brain. Dr. Virani indicated that his findings were consistent with the victim being sexually assaulted. Dr. Virani found the manner of death to be undetermined, in that he was not able to rule out either death by murder or by accident.

Petitioner presented his own medical expert, Dr. Earl Perrigo, an Intensivist and Chief of Medical and Chief of Cardiology at Renaissance Hospital in Detroit, Michigan. Dr. Perrigo was qualified as an expert in pathology and pediatrics. Dr. Perrigo testified that the victim had died from positional asphyxia, probably from being smothered by her mother while sleeping in bed with her. Dr. Perrigo also opined that the girl had died from medical undermanagement at Hurley Medical Center. Dr. Perrigo testified that the victim displayed no signs of being beaten or sexually assaulted and that neither of these actions contributed to her death. Dr. Perrigo further indicated that the findings from the autopsy did not corroborate Kimberly Zavoda's accusations of physical abuse by the petitioner.

After consulting with both of his attorneys, who each advised him to testify, petitioner declined to testify at trial. Petitioner indicated on the record that he was

satisfied with his attorneys' performance, noted that there was conflicting medical evidence, and did not believe that his testimony would impact the verdict.

Dr. Stephen Guertin, the Medical Director and Director of Pediatrics at Sparrow Hospital in Lansing, Michigan, was called as a rebuttal witness. Dr. Guertin testified that the victim's fatal brain injury could have been caused by an inflicted traumatic injury, and he could not rule out abuse as a cause of the injury. Dr. Guertin testified that Dr. Perrigo's suggested method of medical treatment was not the correct protocol, and was, in fact, twenty years out of date. Dr. Guertin rejected Dr. Perrigo's opinion that the victim's injuries had been caused by the child seizing in bed or by her medical treatment. Dr. Guertin testified that the victim had a subscapular hemorrhage, which indicated that the victim could have suffered a concussion. Dr. Guertin noted that seizures commonly occur within four to six hours of a concussion. Dr. Guertin further observed that the victim's cerebral edema could have resulted from a partial lack of oxygen for a brief period of time, possibly while the victim's face was being pressed down into the carpet, which could have blocked the child's airway. Dr. Guertin opined that the victim's injury was also consistent with a shaking injury. Dr. Guertin also testified that contrary to Dr. Perrigo's opinion, only 30 % of children who die from child abuse have fresh injuries such as bruising or internal injuries. Dr. Guertin testified that the victim's injuries were consistent with her lying face or belly down on the carpet with someone thrusting from behind her. Dr. Guertin indicated that

10

this could have accounted for the scrape marks on the victim's knees, stomach, chin, cheek, and forehead and could also have cut off her oxygen supply.

Petitioner was found guilty of all the charges following the trial.

Petitioner filed a claim of appeal and filed a motion for a new trial based upon ineffective assistance of trial counsel. Petitioner was granted a *Ginther* hearing on his ineffective assistance of counsel claims. [3]

At the *Ginther* hearing, petitioner's appellate counsel presented the testimony of Dr. Werner Spitz, the Macomb County Medical Examiner and a noted forensic pathologist. Dr. Spitz agreed that Dr. Virani's finding of positional asphyxia was consistent with his own view of the evidence. Dr. Spitz opined that any asphyxiation could not have occurred prior to 1:00 a.m. on June 20, 1998. Dr. Spitz agreed with Dr. Virani that the manner of death was undeterminable.

Dr. Spitz testified that he was not able to ascertain from the medical records how the victim got into the position which lead to her asphyxiation, although he indicated that it was not uncommon for a small child to be smothered by an adult rolling over them in bed. Dr. Spitz admitted, however, that he could not state in this case that the mother had smothered the victim. Dr. Spitz further acknowledged that accidental smothering by mothers is a rare occurrence and that when it does occur, the victims are usually small babies, not three year olds. Dr. Spitz admitted that Heather Zavoda was not a small baby, but was, in fact, 40

---

[3] *People v. Ginther,* 390 Mich. 436; 212 N.W. 2d 922 (1973).

pounds and 40" tall.

Based upon the materials that he had received, Dr. Spitz could not determine any link between petitioner and his daughter's death. However, he further admitted that he could not rule out petitioner having caused his daughter's death either.

Dr. Spitz initially opined that the victim was brain dead upon admission to the hospital and that any asphyxiation had to have taken place after 1:00 a.m. Dr. Spitz later admitted that he could not determine the precise time that the victim suffered her injuries, although he believed that it would have been closer to 9:00 a.m. on June 20, 1998 than at 1: 00 a.m. Upon further questioning, Dr. Spitz conceded that the victim's injuries could have occurred prior to 1:00 a.m.

Dr. Spitz found Dr. Virani's report in the autopsy about a "contusion of the posterior vagina vestibule" to be contradicted by a later comment in the report that there was no injury to the vagina. Dr. Spitz discounted Dr. Virani's findings of sexual abuse and testified that he did not see any evidence in the medical records that he had examined of bruising on the back of the vagina. Dr. Spitz admitted that both the doctors at Hurley Hospital as well as Dr. Virani had determined that the victim had been sexually assaulted.

Based upon his review of the autopsy photographs of the victim's anal region, Dr. Spitz did not believe that there had been any anal penetration, because there was no evidence of lacerations or bruising. Dr. Spitz conceded, in

12

questions by the prosecutor, that he did not review Dr. Hamp's report from her examination of the victim for possible sexual assault.  Dr. Spitz did not believe that there was any evidence of penetration by an adult penis, but conceded that the victim could have been penetrated by some smaller object, such as a finger or pencil.  Dr. Spitz indicated that one would not necessarily have bruising or deep lacerations with every anal penetration.

Dr. Spitz further opined that he believed that the injuries to the victim's face and chin were caused by the railing on the front porch of petitioner's trailer and he further believed that they were scraping injuries, as opposed to bruising blows.

Dr. Spitz testified that the three areas of subscapular hemorrhaging to the victim's head were not severe and were not a contributing factor to her death.  On cross-examination, Dr. Spitz admitted that this hemorrhaging had been caused by trauma.  Dr. Spitz found no evidence that the victim had suffered a concussion.

Dr. Spitz testified that nothing that he had reviewed would lead him to conclude that the child's death was a homicide and he further opined that her death was likely caused by an accident.  However, on cross-examination, Dr. Spitz admitted that his findings were not conclusive and he further acknowledged that he based his opinion solely on the medical records that he received and not on any of the witnesses' trial testimony.  Dr. Spitz admitted that he did not speak to any of the witnesses before arriving at his conclusion.  Dr. Spitz did not read

13

any of the police reports or review Dr. Virani's microscopic slides.  Dr. Spitz even indicated that he did not reduce any of his findings to writing and was testifying solely from memory.  He further acknowledged that it is sometimes better to look at a homicide victim's body than to review photographs, when an injury is obvious on the body.  Dr. Spitz admitted that the only photographs that he reviewed were photographs supplied to him by petitioner's appellate counsel.

The prosecution called Dr. Virani and Dr. Hamp as rebuttal witnesses at the *Ginther* hearing.  Their testimony was similar to their trial testimony.

Phillip Beauvais testified as a defense witness at the hearing.  Beauvais indicated that he had been appointed as stand-by counsel in April of 1999.  Until June 22, 1999, it was his belief that Swarthout would be lead counsel.  Beauvais opined that it would be extremely difficult to prepare a murder case in three weeks, but indicated he was able to prepare for this case in that time frame. Beauvais asked Swarthout to arrange a meeting with the medical experts that Swarthout had arranged for the defense, but no meeting ever took place. Swarthout indicated to Beauvais that Dr. Perrigo had greater credentials than he actually possessed.

Beauvais testified that it was difficult to prepare an adequate defense for petitioner, in light of the fact that petitioner continued to have "absolute faith" in Swarthout.  Beauvais had advised petitioner that it would be better to defend the case as a credibility contest between petitioner and his wife rather than to raise a

14

medical malpractice defense, as Swarthout had suggested.  Beauvais testified that he discussed the case with petitioner five times before trial and petitioner indicated that he planned on testifying.  Petitioner continued to assure Beauvais throughout trial that he would take the stand in his defense.  In reliance upon these assurances, Beauvais tailored his questions around the idea that petitioner was going to testify.  However, on the morning of the day that petitioner was scheduled to testify, petitioner informed his defense counsel, against their advice, that he would not be taking the stand.

Petitioner also testified as to his dealings with Mr. Swarthout, the facts that he would have testified to had he taken the stand, his reasons for declining to testify, and the evidence that he had requested his attorneys to present that they failed to present at trial.

At the conclusion of the *Ginther* hearing, the trial court agreed that Mr. Swarthout's representation of petitioner had been deficient.  However, the trial court found that petitioner was not prejudiced, because the trial court had appointed Beauvais to act as lead counsel and Beauvais had effectively represented petitioner at trial.  The trial court further concluded that neither Dr. Spitz's or petitioner's post-trial testimony would have lead to a different result had their testimony been presented at trial.

Petitioner's conviction was affirmed on appeal. *People v. Zavoda,* 222305 (Mich.Ct.App. January 18, 2002); *lv. den.* 467 Mich. 909; 655 N.W. 2d 557

15

(2002).  Petitioner seeks the issuance of a writ of habeas corpus on the following

ground:

> The trial court violated the Sixth Amendment right to counsel clause
> by ruling that, although one of two defense counsel had rendered
> ineffective assistance, there was no showing of prejudice to the
> petitioner such that a different result would have been obtained if
> effective assistance had been rendered.

## II.  Standard of Review

28 U.S.C. §2254(d) imposes the following standard of review for habeas

cases:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim–
>
> > (1)    resulted in a decision that was contrary to, or
> > involved an unreasonable application of, clearly
> > established Federal law, as determined by the
> > Supreme Court of the United States; or
> > (2)    resulted in a decision that was based on an
> > unreasonable determination of the facts in light of the
> > evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if

the state court arrives at a conclusion opposite to that reached by the Supreme

Court on a question of law or if the state court decides a case differently than the

Supreme Court has on a set of materially indistinguishable facts. *Williams v.*

*Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs

when "a state court decision unreasonably applies the law of [the Supreme

Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may

not "issue the writ simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly." *Id.* at 410-11.

### III. Discussion

Petitioner claims that he was deprived of the effective assistance of trial

counsel.

Respondent contends that a portion of petitioner's ineffective of counsel

claim, namely his claim that Mr. Swarthout was laboring under a conflict of

interest, is unexhausted.

The Court declines to dismiss the petition on the ground that it contains an

unexhausted claim.  A habeas petitioner may not present a "mixed" petition

containing both exhausted and unexhausted claims to a federal court. *Rockwell

v. Yukins*, 217 F. 3d 421, 423 (6th Cir. 2000).  However, a habeas petitioner's

failure to exhaust his or her state court remedies does not deprive a federal court

of its jurisdiction to consider the merits of the habeas petition. *Granberry v.

Greer*, 481 U.S. 129, 131 (1987).  A habeas petitioner's failure to exhaust his or

her state court remedies is not a bar to federal habeas review of the claim "when

the claim is plainly meritless and it would be a waste of time and judicial

resources to require additional court proceedings." *Friday v. Pitcher,* 200 F.

Supp. 2d 725, 744 (E.D. Mich. 2002); 28 U.S.C. § 2254(b)(1)(A)(c).  Because

17

petitioner's claim lacks merit, in the interests of efficiency and justice, the Court will address petitioner's claim, rather than dismiss the petition on exhaustion grounds. *Welch v. Burke*, 49 F. Supp. 2d 992, 998 (E.D. Mich. 1999).

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must normally satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id.*

The Supreme Court has recognized that in certain Sixth Amendment contexts, prejudice is presumed. *Strickland,* 466 U.S. at 692. The "actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance." *Id.* The *Strickland* court further noted that there was one type of ineffective assistance of counsel claim that warranted a "similar, though more limited, presumption of prejudice", namely, cases involving an actual conflict of

18

interest that adversely affects counsel's performance. *Id.*  This reference was to the Supreme Court's ruling in *Cuyler v. Sullivan,* 446 U.S. 335, 348-49 (1980), where the Supreme Court held that in order to establish a Sixth Amendment violation resulting from the joint representation of multiple defendants by a single attorney, a defendant who fails to object at trial must demonstrate that an actual conflict of interest exists that adversely affected his attorney's performance.

Petitioner initially contends that his first counsel, Mr. Swarthout, was laboring under an actual conflict of interest, because Swarthout took the criminal case *pro bono* with the belief that he would be able to represent petitioner in a successful medical malpractice lawsuit against the doctors for Heather Zavoda's death.  Petitioner alleges that because of this conflict, Swarthout could not abandon his medical malpractice defense.  Petitioner contends that this Court should presume that he was prejudiced as a result of this confict and grant habeas relief.

To demonstrate a Sixth Amendment violation where a trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known, a defendant must establish that a conflict of interest adversely affected counsel's performance. *Mickens v. Taylor,* 535 U.S. 162, 173-74 (2002).  The Supreme Court based its decision in *Mickens* in part on the *Cuyler* case, which as noted above, involved a Sixth Amendment violation arising from the joint representation of multiple defendants by a single attorney.

19

The case in *Mickens*, however, did not involve a conflict of interest based upon multiple representation, but rather, successive representation, where the defendant's attorney had previously represented the murder victim in a juvenile court proceeding.  Although noting that the *Sullivan* rule had been applied "unblinkingly" to various kinds of conflicts of interest that did not involve multiple representation, the Supreme Court noted that the language in *Sullivan* "does not clearly establish, or indeed even support, such expansive application." *Id.* at 175. The Supreme Court further noted that *Sullivan* and the Supreme Court's earlier case of *Holloway v. Arkansas*, 435 U.S. 475 (1978) "stressed the high probability of prejudice arising from multiple representation, and the difficulty of proving that prejudice." *Id.*  However, the Supreme Court in *Mickens* noted that "[N]ot all attorney conflicts present comparable difficulties" and concluded that it remained an "open question" whether *Sullivan* should be extended to cases other than multiple representation. *Id.* at 176.

In the aftermath of *Mickens,* the Sixth Circuit has indicated a reluctance to apply the *Sullivan* rule to conflicts of interest that do not involve multiple representation.  In *Smith v. Hofbauer,* 312 F. 3d 809, 817 (6th Cir. 2002), the Sixth Circuit held that a habeas petitioner was not entitled to use *Sullivan's* lesser standard of proof for an ineffective assistance of counsel claim that arose from a conflict of interest other than multiple representation.  Other cases have reached similar conclusions. *See Whiting v. Burt,* 395 F. 3d 602, 619 (6th Cir.

20

2005)(presumed prejudice standard is inapplicable to an attorney's alleged conflict from representing the petitioner at trial and on appeal); *United States v. Moss,* 323 F. 3d 445, 473, n. 25 (6th Cir. 2003)("As we have discussed, *supra,* the *Mickens* rationale compels our strong hesitation to apply *Sullivan* to conflicts of interest cases arising outside of the joint representation context"). In this case, expanding the presumed prejudice standard of *Cuyler v. Sullivan* "beyond its present borders of multiple concurrent representation would result in the creation of a new rule of law--one that clearly has not been dictated by prior Supreme Court precedent." *Whiting v. Burt,* 395 F. 3d at 619-20.

Moreover, this Court has found only two cases which involved a similar conflict of interest allegation. In *Pina v. State,* 127 S.W. 3d 68, 73 (Tex. App. 2003), the Texas Court of Appeals ruled that the defendant was not denied the effective assistance of counsel, in a prosecution for evading arrest, based on his claim that his counsel had an inherent conflict of interest, due to a prospective civil rights lawsuit that he could file on a contingent fee basis, where the defendant had not shown that the prospect of a civil trial had an adverse effect on counsel's performance or on counsel's trial strategy. In so ruling, the Texas Court of Appeals applied the *Strickland* standard in addressing and rejecting the defendant's claim. *Id.* [4]

---

[4] When there is paucity of federal law on a subject, state decisions interpreting the Federal Constitution, while not binding on a federal court, are persuasive. *See Burns v. Lafler*, 328 F. Supp. 2d 711, 721, n.3 (E.D. Mich. 2004).

Likewise, in *Fuller v. Israel,* 421 F. Supp. 582, 584-85 (E.D. Ill. 1976), the federal district court held that a potential conflict of interest, arising out of a contingent-fee contract between defense counsel, petitioner and petitioner's mother, pertaining to the representation of petitioner in civil matters relating to his unpublished writings and video tapes, allegedly resulting in the denial of the effective assistance of counsel, could not afford a basis for habeas relief without a showing of some prejudice.

This Court concludes that the presumed prejudice standard enunciated in *Cuyler* is inapplicable to petitioner's conflict of interest claim.  Instead, the proper standard would be the *Strickland* standard, in which petitioner would have to demonstrate that he was actually prejudiced by Mr. Swarthout's alleged conflict of interest.

In rejecting petitioner's ineffective assistance of counsel claim, both the trial court and the Michigan Court of Appeals concluded that although Mr. Swarthout's performance may have been deficient, petitioner was not prejudiced by this performance, because the trial court had appointed Phillip Beauvais as lead counsel and there was no showing that Beauvais' representation was ineffective.

Petitioner argues that the Michigan Court of Appeals erred in ruling that petitioner was not prejudiced by any deficiencies in Swarthout's performance, in light of the fact that he was represented by Beauvais.  However, a defense

22

counsel's alleged deficiencies do not establish ineffective assistance of counsel, where the defendant is represented by competent co-counsel. *See Bowling v. Parker,* 344 F. 3d 487, 509 (6th Cir. 2003)(fact that lead defense counsel was indicted during capital murder trial did not establish that defendant was denied effective assistance of counsel, absent any evidence that co-counsel's performance was substandard); *Mason v. Mitchell,* 320 F. 3d 604, 617 (6th Cir. 2003)(lead counsel's absence during parts of jury selection at defendant's trial for aggravated felony murder and rape did not constitute ineffective assistance; defendant consented to absences, and co-counsel conducted effective *voir dire*); *Bonin v. Vasquez,* 794 F. Supp. 957, 969-70 (C.D. Cal. 1992)(defense counsel's absence from trial was not ineffective assistance, where second counsel was prepared to cross-examine prosecution witness); *McDougall v. Rice,* 685 F. Supp. 532, 539-40 (W.D.N.C. 1988)(although performance of defense counsel was deficient two times when he was unable to conduct examination of witnesses at state criminal trial, no prejudice resulted and defendant was not denied effective assistance of counsel where co-counsel took over and conducted examinations very effectively).

Petitioner first contends that neither Mr. Beauvais or Mr. Swarthout presented any defense on his behalf.  Defense counsel must investigate all appropriately substantial defenses available to the defendant and must assert them in a timely manner.  *Fornash v. Marshall*, 686 F. 2d 1179, 1187 (6th Cir.

23

1982).  The right to the effective assistance of counsel is violated where, through his or her own ineffectiveness or incompetence, defense counsel deprives a criminal defendant of a substantial defense. *Williams v. Abshire*, 544 F. Supp. 315, 318 (E.D. Mich. 1982).

Petitioner's primary contention appears to be that both of his trial counsel were ineffective in failing to call an expert witness to challenge the findings of the prosecution's medical experts that the victim had been sexually assaulted and that the manner of death was a homicide.  Petitioner contends that the testimony of Dr. Spitz would have presented a viable defense that the victim's death was an accident and that the victim had not been sexually abused.

As a general rule, whether or not defense counsel should have hired a medical expert is the type of strategic choice by counsel that may not be second-guessed on habeas corpus review. *See Murden v. Artuz,* 253 F. Supp. 2d 376, 389 (E.D.N.Y. 2001).  In order to obtain habeas relief, petitioner must show that had counsel presented Dr. Spitz's testimony at his trial, there would have been a reasonable probability of a different outcome. *See Pondexter v. Dretke,* 346 F. 3d 142, 148 (5th Cir. 2003).

In rejecting petitioner's ineffective assistance of counsel claim, the trial court indicated that it did not believe that there was a reasonable probability that Dr. Spitz's testimony would have affected the outcome of petitioner's trial.  The trial court believed that Dr. Hamp's testimony that sexual abuse had taken place

24

would have been more credible than Dr. Spitz's testimony that no sexual abuse

had occurred, in light of the fact that Dr. Hamp was an expert in the field of child

abuse, whereas Dr. Spitz made it clear that he was not an expert in the field of

sexual assault.  Although noting that there was a difference of opinion between

Dr. Virani and Dr. Spitz about whether there were injuries to the victim's rectal

and vaginal areas, the trial court noted that Dr. Virani's findings were supported

by Dr. Hamp's findings.  The trial court acknowledged that Dr. Spitz

unequiovocally stated that the victim's death was accidental, although it further

observed that Dr. Spitz agreed with Dr. Virani that the cause of death was

positional asphyxia.  However, the trial court further noted that the jury would

have heard that accidental deaths of a child being smothered by an adult in bed

happen in most cases to a very small child, not to a three year old child like the

victim.  Finally, the trial court noted that Dr. Virani's testimony was also

supported to an extent by the testimony of Dr. Nolan and Dr. Guertin, who both

testified that this was a case of child abuse, not an accident.  The trial court

further noted that the eyewitness testimony showed that petitioner had engaged

in "rough handling" of the victim on the night in question.  Finally, the trial court

believed that petitioner's behavior after the victim's injuries were discovered

established petitioner's guilt.

In this case, the state trial court made a factual finding that petitioner's

proposed expert witness was less credible than the prosecution's expert

witnesses on the issue of whether the victim's death was accidental or a homicide and whether she had been sexually abused.  This Court, sitting in habeas review, is required to give substantial deference to the state court's credibility determinations with respect to the different expert witnesses. *Pondexter,* 346 F. 3d at 147-49.

Petitioner has failed to show that his defense counsel was ineffective for failing to call Dr. Spitz at his trial to testify that the victim's death was accidental, because petitioner has failed to show that such testimony would have been persuasive. *See Neverson v. Bissonnette,* 242 F. Supp. 2d 78, 91 (D. Mass. 2003).  The fact that Dr. Virani performed the autopsy on the victim could be a reason in and of itself for the trial court to credit his testimony over that of Dr. Spitz's concerning the manner of death. *Pondexter,* 346 F. 3d at 151.  Moreover, in light of the fact that the prosecution presented four expert witnesses who opined that the victim had been physically and sexually abused, petitioner is unable to show that the testimony of Dr. Spitz would have been sufficient to overcome the testimony of these four witnesses to the extent of showing a reasonable probability that the result of his trial would have been different. *See Elliott v. State,* 325 Mont. 345, 348; 106 P. 3d 517 (Mont. 2005).  Finally, Dr. Spitz admitted that he could not state in this case that Kim Zavoda had accidentally smothered the victim and conceded that he could not rule out petitioner having caused his daughter's death.  Because Dr. Spitz's testimony

26

could not conclusively rule out the prosecution's theory that the victim's death was a homicide, petitioner was not deprived of the effective assistance of counsel. *See Hollins v. Terhune,* 40 Fed. Appx. 353, 354 (9th Cir. 2002).

Moreover, as the state trial court indicated, there was additional evidence that supported the jury's findings that the victim's death was a homicide. Several witnesses observed petitioner hitting or kicking the victim on the day prior to her admission to the hospital. There was evidence that petitioner had physicially assaulted the victim and her brother in the past. Morever, petitioner's behavior after Kim Zavoda noticed that the victim was having medical difficulties was suspicious. Petitioner refused to allow Kim Zavoda to call 911 to summon an ambulance. Petitioner did not go to the hospital to visit his daughter prior to being arrested, going instead to several friends' houses. When informed by Kim Zavoda that the victim's medical condition was critical, petitioner replied, "Well, it looks like we've got a dead daughter." Finally, petitioner made a threat to kill Thomas Shellenbarger after he testified at the preliminary examination. In light of this additional evidence against petitioner, including his history of violence, defense counsel's failure to call an expert witness to testify that the victim's death was accidental did not prejudice petitioner, so as to support a finding of ineffective assistance of counsel. *See Gimenez v. Alameida,* 135 Fed. Appx. 20, 21-22 (9th Cir. 2005).

Petitioner also claims that Mr. Beauvais failed to adequately cross-

27

examine several of the prosecution witnesses about various inconsistencies in their testimony.

"Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub,* 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002).  "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Id.*

In the present case, defense counsel's performance did not constitute ineffective assistance of counsel where the record shows that defense counsel carefully cross-examined the prosecution witnesses and impeached their credibility (*See* Tr. III, pp. 44-53, 95-133, 168-175) and in his closing argument emphasized the inconsistencies and weaknesses in the testimony of the various witnesses (*See* Tr. VI, pp. 76-88). *See Krist v. Foltz,* 804 F. 2d 944, 948-49 (6th Cir. 1986).  This also defeats petitioner's related claim that defense counsel failed to provide a viable defense.  Mr. Beauvais in his opening and closing statements challenged the credibility of the witnesses and pointed out that there were no eyewitnesses who actually witnessed petitioner sexually assault the victim or inflict any fatal blows.  Because counsel provided a viable defense for petitioner, this portion of his ineffective assistance of counsel claim also fails. *See Stevens v. United States,* 298 F. Supp. 2d 657, 661 (E.D. Mich. 2004).

Petitioner further claims that Swarthout's decision to advance a meritless

medical malpractice defense lead petitioner to decide against testifying.  First, petitioner's claim is without merit, in light of the fact that the record establishes that Beauvais had met with petitioner on at least two occasions, discussed his right to testify with him, and prepared his testimony. *See Foster v. Ward,* 182 F. 3d 1177, 1186-87 (10th Cir. 1999).  Moreover, because the trial record indicates that several lay and expert witnesses corroborated the prosecution's version of events in this case, petitioner has not shown that he was actually prejudiced by his failure to testify so as to support an ineffective assistance of counsel claim. *See Gonzales v. Elo*, 233 F. 3d 348, 357 (6th Cir. 2000).

Petitioner next claims that his counsel was ineffective for failing to object to evidence concerning petitioner's previous assaultive behavior against his daughter and his son.  The Michigan Court of Appeals, however, found that this evidence was admissible pursuant to M.R.E. 404(b) to show the absence of mistake or accident on the part of petitioner and to show that the child's coma and death were not accidental but were inflicted by petitioner. *People v. Zavoda,* Slip. Op. at * 4.  The Michigan Court of Appeals' determination that petitioner was not denied the effective assistance of trial counsel because of counsel's failure to object to the admission of this "bad acts" evidence was not contrary to, or an unreasonable application of, clearly established federal law, and thus did not warrant federal habeas relief, in light of the Michigan Court of Appeals' finding that this "bad acts" evidence was admissible under Michigan law. *See*

29

*Pearl v. Cason,* 219 F. Supp. 2d 820, 828-29 (E.D. Mich. 2002); *aff'd* 86 Fed.

Appx. 858 (6th Cir. 2004); *cert. den.* 125 S. Ct. 2511 (2005); *reh. den.* 126 S. Ct.

16 (2005).

Petitioner lastly claims that his trial counsel was ineffective for failing to

object to the prosecution calling Dr. Guertin as a rebuttal witness.  However, the

Michigan Court of Appeals determined that Dr. Guertin was properly called as a

rebuttal witness. *People v. Zavoda,* Slip. Op. at * 4-5.  Trial counsel's failure to

object to this testimony did not amount to the ineffective assistance of counsel,

in light of the fact that Dr. Guertin was a true rebuttal witness. *See Green v.*

*Norris,* 12 F. 3d 821, 823 (8th Cir. 1993).

## IV.  Conclusion

The Court will deny the petition for writ of habeas corpus.  The Court will

also deny a certificate of appealability to petitioner.  In order to obtain a

certificate of appealability, a prisoner must make a substantial showing of the

denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  To demonstrate this

denial, the applicant is required to show that reasonable jurists could debate

whether, or agree that, the petition should have been resolved in a different

manner, or that the issues presented were adequate to deserve encouragement

to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  When a

district court rejects a habeas petitioner's constitutional claims on the merits, the

petitioner must demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims to be debatable or wrong. *Id.*  A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States,* 310 F. 3d 900, 901 (6th Cir. 2002).

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right.  Jurists of reason would not find this Court's resolution of petitioner's claims to be debatable or that they should receive encouragement to proceed further. *Myers v. Straub,* 159 F. Supp. 2d 621, 629 (E.D. Mich. 2001).

## V. ORDER

Based upon the foregoing, IT IS ORDERED that the Petition for a Writ of Habeas Corpus is **DISMISSED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a Certificate of Appealability is **DENIED.**

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

Dated:  November 8, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on November 8, 2005, by electronic and/or ordinary mail.

s/Josephine Chaffee
Secretary/Deputy Clerk

31